Case No. 16-1159, et al., SoundExchange, Inc., Appellant v. Copyright Royalty Board, et al., Mr. Horwich, for the Appellant, SoundExchange, Inc., Mr. Johnson, for the Appellant, George Johnson, Ms. Carson, for the Appellees, Mr. Angstreich, for the Interreaders, NAB, and iHeart Media, Inc. SoundExchange, Inc. SoundExchange, Inc. Good morning. Good morning, Your Honors. May it please the Court, Ben Horwich for Appellant, SoundExchange. The copyright judge's decision in this case rests on their answer to, and I'm quoting from their determination, the legal issue of whether effective competition is a required element of the statutory rate. They held, incorrectly, that they must hypothesize an effectively competitive market in which to set rates that may differ, and here they thought did differ from the actual marketplace. And it's that misconceived legal holding in particular is why the copyright judges took the steered rates from the Pandora-Merlin Agreement and the iHeart Warner Agreement and used those as the entire basis for the most important rate in the proceeding, which was the 17 hundredths rate that was set for the non-subscription webcasting. And if there were any doubt that this was a legal determination, obviously they refer to it as such several times in their decision, and it's not a factual one. The Court should actually look at how the copyright judges deployed that legal determination in refusing to entertain key evidence that we, as the artists and record companies, offered them about what would actually happen if the parties were negotiating in the marketplace. And this occurs at Joint Appendix 746 is where the discussion comes to ground. This is in the second volume, although the material I'm referring to here is not sealed. But on 746, this is the culmination of a discussion where the webcasters had said, well, look, look, we have these steering deals. They have lower rates in them that are steering. And we, as the copyright owners, said, well, but it's mathematically impossible to steer in favor of everyone. You can't play everyone's records above average. Yes? The 746 is the non-sealed? I'm actually referring to the version that is in the sealed volume, although the material that is there is not. All right. I looked at that and I was trying to figure out whose document is that. Oh, the 746 document? That is the copyright royalty judge's determination here. It's presumably also in Volume 1, no? It is also in Volume 1. It's, of course, complicated to go back. I'm happy to refer to Volume 1 if that's easier for the court, but there are sometimes points where the court may wish to have in front of it the sealed material. I mean, this particular point is not, but rather than ask the court to shuffle papers, I thought I would. So all I'm getting at is when I get to that 746, I see sort of a transcript, and I see the part about sub 2 anti-steering or MFN clauses. Yes. That's what you're referring to. So there is a quotation there from… Right. Dr. Rubenfeld? Yes. Judges? Right. All right. Right. But that is the judges in their determination quoting from his testimony on a point that's relevant to their determination. Exactly. So at this point in the analysis, the webcasters have said, look, we have these steering deals. They have lower rates. We as the copyright owners said, well, you can't incorporate into an industry-wide statutory license something that promises to play everyone's records above average rates. And then the response to that on the other side was, well, we think we as the webcasters would threaten you with steering. We'd go into the negotiating room with a record company, and we would say, well, we're going to steer against you, and so you better cave and give us lower rates. That's the way to avoid us with this threat of steering. And then we came back and explained that the record companies, and in particular the major record companies that make up most of the market, would respond with these things that, Judge Rogers, you just referred to. They would say, well, look, no, we're not going to cave to that threat. We won't give you our repertoire. Or we will want a most favored nation clause so that we're on parity with everyone and you won't be able to do that. Or if you look at on 748, we would offer up front, we'd ask for up front royalty payments so you wouldn't be able to threaten to do that kind of stuff. And the judges did not reject that as a factual matter. In this section, they say, and I would start back on 746, toward the bottom above the footnote, they would say, well, that's fine, but it would be antithetical to the effective competition requirement inherent in 114F2B. And then it's a similar effect if you flip over to 749, right above heading H, where they kind of finish off this section about can the majors in the negotiation process thwart this hearing. They say, well, all three, I'm quoting from right above heading H, all three contracting devices would be inconsistent with the statutory direction to set rates in an effectively competitive marketplace. And so they're rejecting our evidence as a legal matter. And we, of course, have explained in our briefs at some length why that's an incorrect legal interpretation of the Copyright Act. And the government scarcely defends most of the legal analysis that the CRJ is engaged in. If you go back to 748, that's the beginning of a, I don't know, it's about ten pages or something of legal analysis from the copyright judges. The government has very little to say in defense of that legal analysis. And I think that's rightly so. Because the Copyright Act doesn't say anything about effective competition. So let's just say, hypothetically, and just indulge my assumptions on this. I know you're going to get to some of it. But let's say that I agree with you that there's a legal determination at work here. And let's also say that based on just a read of the statute, that I don't buy your argument as to the way the statute has to be read to deny this effective competition rationale. I don't buy the notion that the statute has to be read to compel the effective competition rationale either. All right? So I just think that it's something that could be done. It's not compelled either way. And then what we're left with is a decision under your view, and I'm agreeing with your purposes, that the decision does rest on the legal conclusion that their effective competition is the ultimate goal. And then we have an order that adopts that logic. We have, by hypothesis, a judge who doesn't think that it's compelled one way or the other. And then we have a government determination that rests on it, but a government brief defending the determination that doesn't invoke Chevron. Yes. What are we supposed to do? Well, I guess I would say two things. First of all, the court has held in prior cases that a party's failure to invoke Chevron forfeits it. So I don't think — Wait. We've said that? Yes. And I have a couple of cites for you, which I confess are not in the briefs. Yeah, I'd like to. But I would point you to a case called New Star, which is 857 F. 3rd at 893 to 94, which I think in turn cites a case, Lubow, and it's cited there in New Star, but the Lubow citation, I believe it's 783 F. 3rd at 884. Lubow, I know, was written by a rather indistinguished judge who's sitting on this panel and asking you questions right now. Okay, so those are the two cites you have? That's what I have here. We could certainly offer the court more — a supplemental brief on that if that would be helpful. But I would want to — And then what happens? So then — Well, I guess what I would say is this, is that at a minimum, it has to be the agency that's resolving the ambiguity. We can't just say it's ambiguous, they blundered into this reading, and it's not an impermissible reading of the statute. Although if I could, I would like to come back and fight some of the premises about this. No, I know you're going to fight the assumption. But the agency did in its determination. It did do that. It did, but — The brief doesn't address Chevron, but the agency's determination does go through a lengthy analysis of why that's the correct interpretation of the statute. Yes, but I think it's important to look at exactly where the agency thought the ambiguity was. The agency did not say the ambiguity is in what willing buyer, willing seller means. The agency located the ambiguity in the meaning of competitive information. And that's clear if you look at, I believe it's JA 651 is where they say. That's the ambiguity they identified. The problem with identifying that ambiguity is that that ambiguity is, in fact, contrary to law. And let me explain why. Okay, so you're fighting the assumption. I just want to make sure that — No, I'm actually not. Oh. Well, I may be fighting your assumption, but in a somewhat perhaps surprising way, which is this. Okay. Which is that the copyright judges are bound in the statute, bound by the statute, to abide the register's determinations of law, the determinations of law made by the Register of Copyright. So they have to act in accordance with those. The Register, and we've explained this in our brief on pages 45 and 46, the Register had previously confronted the question whether that sort of a phrase, competitive information, was ambiguous in a way that would influence the ultimate statutory standard of a fair market value, willing buyer, willing seller construct. The Register did that in the context of a Section 119 satellite retransmission proceeding. But the section, as we spell out in the brief, the Section 119 proceeding is exactly — it's actually structured in exactly the same way. And the Register said, and we have this — it's in the Federal — it's published in the Federal Register. The Register said, I don't interpret that to influence the meaning of what — of what a fair market value standard, how that gets applied. And then in turn, the — the Register had told the copyright royalty judge's predecessors, the CARB, in the context of Webcaster 1, the first proceeding, this is Web 4, this is — that was Web 1, actually had told the Copyright Arbitration Royalty Panel to refer to the Register's Web — excuse me, to the Webcaster's Section 119 analysis for guidance in how to interpret 114F2B. So the Register has already told this body that competitive information is not a source of ambiguity in applying the statute. So in that respect, the ambiguity that the copyright judges identified is one — the only ambiguity they identified is one that they were not free under the statute that requires them to follow the Register to identify. I know that's a convoluted — convoluted explanation, but I think it's really important because that then leaves them back with the agency's view that copyright judges otherwise just have a view that the statute requires us to do this. And so they don't believe it's ambiguous. If I could, though, could I — I would actually like to fight the premise about ambiguity or at least — I would at least like to urge the Court that effective competition is not a permissible construction of the statute. And it's not simply a textual point. Because in the — in the Digital Millennium Copyright Act in 1998, which is what kicked off these sort of proceedings, Congress drew a clean line between legacy services and new services. And Judge Rogers and Judge Griffith, I know your Honors are familiar with this from the Sound Exchange Against MUSAC appeal, which was less than a year ago, in which the Court explained that the purpose there was to move the industry to market rates and to get — and Congress wanted to get out of the business of having any sort of policy-driven rate-setting proceeding of the sort that is — that it did grandfather in for those legacy services. But it said, henceforth, we want this to be on market rates. The problem with what the copyright judges have done in this case is that they said, well, we're not actually going to look at what these parties would have done if they were free to negotiate in the marketplace, which is, of course, what the statute says. Instead, the copyright judges said, we're going to look at what we sort of wish they would have done, ideally, if this were an effectively competitive market. And the problem with that is that that's just back into the policymaking fight again about, well, how should this market look? The copyright royalty judges are not, in this proceeding, a central planner who decides what the right level of competition or output or anything in this market is supposed to be. They do retain a role that's something like that for those legacy services when they're applying the 801B1 factors that we explain in our brief do apply to those legacy services. But Congress wanted to get out of that business in the DMCA. And so to have the copyright judges say, we're going to go back into it by considering things that wouldn't actually occur in the marketplace when inhabited by these players seems to me to directly countermand the fundamental structural choice that Congress made in 1998. So regardless of whether you think there's some elasticity in the paths that the copyright judges can take in terms of looking at evidence and making judgments about what those ultimate rates are, the destination that they have to get to is still rates that would have been negotiated in the marketplace. And that marketplace, when we're referring to the marketplace, it's not a marketplace from some parallel universe. It's inhabited by the same artists, the same record companies, the same sound recordings. The very fact that Congress established the regime sort of indicates that they didn't just want to replicate what would have happened in the absence of the regime. No, I don't think so. And this is explained in this court's RIAA decision from 2010, which is cited in the briefs, which is that Congress had made kind of an independent policy choice that at the time of the DMCA, we saw that there would be this potential for Internet radio and that people would be out there who would want to stream these. We wanted to give them, we, Congress, want to give them comfort that they will be able to get a license. So we're going to promise them that there will be a license offered to them. And then as the court explained in RIAA, having said we're going to give you a license, Congress then has to set up some mechanism to operate as a fallback if the parties can't agree among themselves. So the reason the proceeding exists is not because Congress is trying to achieve any particular policy objective. It's completely clear that it's trying to avoid the prior regime of policy objectives when it had the DMCA amendments carve out these new proceedings from those prior policy objectives. Congress was simply, you know, being ready to step into the gap if the parties couldn't agree on a rate. But what it said was market rates. And that then parallels the market rates that would obviously, and do obviously, obtain in, say, the space for interactive transmissions of sound recording. So these are only non-interactive where you don't have, as the user, you don't have kind of on-demand functionality to pick what you want. In the space where you do have that ability to pick what you want, their market rates operate because there is no statutory license. But Congress's overall design in the DMCA is that all of these new services, whether they're interactive or non-interactive, subscription or not, they are all to be on market rates because we want to get out of the policymaking business here. I see my red light is on, but if I might say a few words about perhaps the segmentation issue. I think the three, I'd like to make just three points on that briefly. The first one, and I'm speaking here about the decision to set separate rates for subscription and non-subscription webcasting. The first is the basic point that just because somebody is selling their service for free doesn't mean that they're paying anything less to their suppliers who are giving them the inputs they need in order to sell that service. We can think about the familiar example of network television. You and I can all tune in to network television for free, but I assure you the people who are making the shows are getting paid for that. And so the basic intuition that, oh, well, let's just look at what people are ultimately paying, is not going to reliably tell you what happens upstream in terms of the content creation. The second point is that that's not just a point about kind of basic rationality of the decision making. It's actually grounded in the statute, because the statute talks about the rates that would be negotiated between willing buyers, who are the webcasters, and willing sellers, who are the copyright owners. It doesn't talk about the listeners, and so the idea that you would look at the listeners and say, well, I've satisfied a statute that talks about two other parties doesn't seem to respect the statutory standard. And then the third thing I would say is that at a bare minimum there's a procedural problem here, which is that the copyright judges have a really good framework for thinking about these questions about segmentation. They come up every time, and they have sometimes segmented separate services, and sometimes they don't. In this proceeding itself, they went through that sort of an analysis. That analysis looks at a number of factors. Certainly some of the things that the government and the interveners point to as points in their favor are probably relevant to some of those factors. But what the agency didn't do is apply its standard test and framework for analyzing these questions. And so at a minimum it's capricious for the agency to say, well, we're not going to cite our test. We're not going to rely on our test. We're not going to explain to you why we're not doing it. We're just going to say we see listeners who don't want to pay, and so we think we can set a different rate. We think that that does not suffice. And I'm happy to answer questions that the Court might have about what we've described as the shadow issue. I would want to give the Court some comfort that we are certainly not suggesting, as the folks on the other side have said, that this is somehow hopeless to use benchmarks. It's just that sometimes when the statutory rate is low, the agreements that you would get in the marketplace that might be useful benchmarks are going to come few and far between. And you'll have to look at them hard and be very careful with the inferences you draw from them. Here, as I think we noted in the brief, you've got a potential of eight big bilateral deals that could have been reached between one of the four copyright owner interests and one of the two big webcasting interests. And six of those deals just don't even exist. So there's clearly something going on where everyone is, well, not everyone, but most deals are just proceeding under the statutory framework. And so in that setting, it may be more difficult to use the benchmarks, but it's not that the whole concept of using benchmarks would be hopeless. And then certainly, as we've explained in the material that's sealed, and it would be somewhat difficult to talk about, is that the particular way that the rates were then taken out of the loan to deals that are somewhat unusual that are in the record, the way those rates were kind of taken out of context is very much problematic. Unless the Court has anything further. Thank you. I appreciate it. Good morning. Good morning, Your Honors. If it pleases the Court, my name is George Johnson, and I'm a singer-songwriter in Nashville, Tennessee for the past 20 years, representing myself. I'm grateful for you allowing me to participate in our arguments and in this case. In addition to my own interests, in theory I represent the interest of every individual American singer, artist, musician, and 114 sound recording copyright creator who, like I, are all subject to the relatively new compulsory license for digital sound recordings, first introduced in the 1995 Digital Performance Rights and Sound Recordings, and then the 1998 Digital Millennium Copyright Act. The CRB is obligated to determine a reasonable royalty rate in an open marketplace in .00 cents per stream is not a reasonable rate for a copyright creator, in my opinion. There is no open marketplace with a digital compulsory license, and there is no willing seller at .00 cents per song. No singer would negotiate .00 cents if they were in an actual open market. .00 cents is so low it deprives us of the benefit of our creativity, investments, and incentive. While I realize we're here to determine the narrow question of whether or not a rehearing should be granted, as a music producer, I would like to ask your Honor to declare the DMCA and 114 compulsory licenses null and void and unconstitutional, but I don't think we can do that, but it would solve these problems. Let licensees negotiate in an actual open marketplace. For all those in favor of a compulsory license for singers at .00 cents, I would ask you to imagine if there was a lawyer rate board that set billable hours for every American attorney at a statutory rate of .00 cents per billable hour. Would counsel still claim that we must have a compulsory license for all American singers? And what citizen wouldn't want a free attorney for .00 cents? But there are two primary constitutional questions I raised in my opening brief. First, whether the CRB should properly consider and waive the exclusive right of an individual U.S. copyright creator under Article I, Section 8, Clause 8, and Section 106 of the Copyright Act. And second, whether the CRB has imposed rates so low at .00 cents per song that they are literally confiscatory, as cited in my brief from Duquesne Light versus Barrage. In layman's terms, do I have a constitutional exclusive right to my song or not? And secondly, is .00 cents royalty unconstitutional? And to me, the answer is clearly yes. What I'm afraid of is that if we are granted a rehearing, none of my proposals will be accepted and any changes will only be .0001 in nature, if at all. Singers and sound recording creators will still be getting .00 cents per stream, which is not a reasonable rate for their sound recordings. In addition, any proposed changes to terms like free offline listening without a sale or limited downloads under Section 385 subparts B and C will still remain legal, and to me that's a violation of an author's exclusive right and by giving away a sale. We hope the Court can review whether the judges have ignored the practical commercial reality that in arbitrarily setting the royalty rate for the licensor so low that it is not feasible for them to make a living from their creations. The public ultimately will be deprived of the benefit of their creations. If a singer, songwriter, studio musician, or sound recording producer cannot make a living from his or her creations, then they cannot be expected to compose, record, or sing more songs. In ignoring or discounting that factor, as it appears they have done, the judges acted arbitrarily and unreasonably. Moreover, it is the responsibility and duty of the CRB judges to consider these constitutional questions in the first instance so that the Court may review the conclusion of the judges. I also argue that the application by the judges of the statute to these facts unconstitutionally deprive me and other copyright creators subject to the license, properly recognized rights in the Copyright Act and Article I, Section 1. Unless the copywriter's owners are fairly compensated for the use of their property, all of the rewards associated with ownership of copyright benefit only benefit the licensees. Throughout the hearing I've used legal and industry terms such as substitutes for and cannibalization, meaning that streaming audio diminishes sales of tangible content. Why would a consumer buy a CD or download, resulting in a royalty to the owner, when the consumer can stream the same content for free, resulting in no practical royalty to the owner of the copyright? The judges either disregarded this evidence or ignored the facts. Under Title 17 U.S.C. Section 114, F.2.B.1, the judges must specifically consider whether the streaming service may substitute for sales of phono records or otherwise affect the owner's streams of revenue. And this is precisely what has happened over the past 15, 20 years, and it has been devastating to us. Copyright is about a private incentive and private motivation. As Justice Breyer declared about private motivation, I think in response to 20th Century Fox v. Aiken, when technological change has rendered literal terms ambiguous, the Copyright Act must be construed in light of this purpose. And so that begs the question, that .0 cents, is that an incentive to create? Of course it's not. And can we look at the basic word, term, exclusive right, which I think has been eviscerated some. I will say, end on this, that former Register of Copyright Mr. Ralph Amann wrote a brilliant quote a few years ago for a book called The Constitutional Foundations of Intellectual Property and Natural Rights Perspective. Written by Randolph May and Seth Cooper. And it demonstrates that copyright is a natural right and not a right given to us by the government like other rights, free speech. Mr. Amann's quote perfectly describes to me the legal mess we copyright owners kind of find ourselves in. He talks about the two talented authors and intellectual heft of the ongoing debate of the true nature of copyright as an exclusive private property right or as a limited right to be doled out stingily, riddled with exceptions and limitations and to be given away free of charge. And to me, that's what webcasting is, giving away music free of charge. And the limitations are, to me, the 1995 Digital Performance and Sound Recording Act and the 1998 DMCA Safe Harbors and compulsory license for singers, as well as Section 385 subparts B and C, which from what I understand were created out of thin air in phono records 1 and 2. And so I hope your honors will respect the exclusive right of copyright that we rely on and consider that the resulting rates that the judges determined were confiscatory at zero cents without Article 3 due process. And we believe the determination of the judges should be reversed with directions to conduct an additional hearing at which I would present additional evidence and testimony. And I thank you all so much. Thank you. Do you have any questions? No? I understand your position. Thank you so much, your honors. You have a great day. Thank you. Good morning. We've had some discussion about effective competition in Chevron, and so I'd like to start there, unless the court has a different preference, and make two points. First, to explain why this argument rests on a mistaken premise, and then second, to take it on sound exchanges terms. So the judges here, in saying effective competition, are assigning a label to the idea that has pervaded all of their prior rate-making decisions and the decisions of this court, which is that the non-interactive services market has a level of competition that is neither perfect nor reflective of monopolistic or oligopolistic price practices. Here, the market that the judges, that Congress instructed the judges to consider was one in which a willing buyer and willing seller would negotiate to an agreement for a market where copyright owners simply don't have the same bargaining leverage as they enjoy in the non-interactive services market. And in saying all this, the judges are not filling a gap. They're not doing anything that would require Chevron deference. But to take that argument on its own terms, both the judges and the government in its brief explained that the judges' interpretation was reasonable. The determination seems to assume that it is an issue of statutory interpretation. It has a lengthy section devoted to explaining why effective competition is the right way to interpret the statute. So didn't the copyright judges think that they were engaging in basically a Chevron exercise? My point, Your Honor, is that the copyright royalty judges didn't understand themselves to be filling any gap. All they understood themselves to be doing was carrying forward the same understanding of the competitive dynamics in the non-interactive services market that they've always held. Now, if sound exchange were right, that the judges were doing something that was actually new here, the determination would look very different. When you say they didn't understand that they were filling a gap, I'm not sure exactly what that means. Does that mean that you don't think that they were engaging in something as to which Chevron deference, even as a matter of conceptual, as a matter of concept, applies? So, Your Honor, let me pivot to taking that argument on its own terms. To the extent that Chevron is arguably implicated here, the judges and the government in its brief explained that the judges' interpretation was reasonable. On page 18 of our brief, in the standard of review, we cited this Court's decision in IBS at 574 F3rd 757, where this Court explained that in reviewing the judges' decision it was, quote, applying lessons of Chevron. So to the extent that this Court wants to think about what the copyright royalty judges did in Chevron terms, it's perfectly fine with us to see it that way, and we certainly have not waived that argument. My point is simply that the judges here are not imposing a normative vision of what the non-interactive services market should look like. They are merely explaining that the bargaining power that copyright owners enjoy in that market is materially different from the power that they enjoy in the interactive services market in a way that makes evidence from that other market not analogous. And I don't take it seriously. You can't just go out in the regular market. It's not filling a gap. But it's trying to explain what Congress must have meant when it used this term in this context. Isn't that correct? Your Honor, I think that's a perfectly fair summation of what the judges are doing, and as I explained, to the extent that the Court wishes to see it that way... I know, I know, but you seem to be fighting us on that, and I'm not sure why. So forgive me, and let me take a step back. I don't mean to fight the Court at all. Fight may be the wrong word, but I'm just saying you're not encouraging us to pursue that line of analysis, and I'm just not clear why. So, Your Honor, I think that line of analysis is not necessary to uphold the judges' determination, but it's perfectly fine and consistent with the government's brief. And if we don't apply that analysis, then what do we do? Well, if you were not to apply that analysis, you would look simply at the evidence that was in the proceeding and conclude... And decide whether the decision was arbitrary and capricious? That's right. And as the judges explained at length, copyright owners in the interactive services market are not similarly situated to copyright owners in the non-interactive services market, because, of course, an interactive webcaster has to be able to provide on demand any song that a listener might wish to hear. And the evidence in this case, and the judges discussed this at length, particularly at pages 729, excuse me, in the sealed JA, volume 729 to 749, that the fact that non-interactive webcasters can steer, they can prefer music that carries a lower copyright royalty rate without alienating their subscribers, show that copyright owners simply cannot get away with some of the terms that they would insist on, be able to insist on in the interactive services market. And that makes SoundExchange's model, which I don't think it's really defending here, not analogous, at least on its face, to the market that the judges are instructed to set. So I guess it's hard to disagree with anything that you're saying in terms of what's grounded, what's in the determination. It seems to me that everything that the government outlined in its brief as to why the discount off the SoundExchange rate makes sense in the non-interactive market, and why it was not arbitrary and capricious to reach that conclusion, is in the determination. And I can understand why that would be the way you would argue the arbitrary and capricious point. What I still don't understand conceptually is why there's not a chevron. And I don't mean to suggest that there definitely has to be. All I'm meaning to suggest is I'm not quite following what the argument is as to why the brief didn't begin the way the briefs normally would when you're responding to a point about statutory interpretation and an analysis of statutory interpretation in the underlying determination. Usually the brief would start with this two-step chevron, the now familiar two-step chevron framework, and it does the same song and dance, and that's the familiar territory that we operate in all the time. And I'm not quite following why does the government think that that's not germane here when just my assumption is that it would be the obvious thing you would turn to first. But I could be wrong. So, Your Honor, two points. First of all, I don't at all mean to suggest that the government disavows the question whether the, as Judge Reuters aptly put it, any ambiguity that might be latent in the term willing or any other provision of the statute was not part of the decision below before the judges and could not be part of this Court's analysis. I mean, I suppose I'm in the uncomfortable position of suggesting that maybe the brief that I filed was too short. But we didn't think that it was necessary in this case. And as, again, I said, the standard of review and the part page of this Court's decision in the IBS case that we cited, which averts the chevron, we thought that sufficient to make the point that to the extent that statutory interpretation is involved. So here's the way it seems like it could be necessary potentially to me, and I may be missing something in the analysis, but suppose that what the evidence shows and what the Copyright Board says is we think that the steered component of these agreements capture price competition in the marketplace. And so if we're trying to get to a place that involves actual price competition as opposed to the interactive services market where there isn't, that's what the copyright judges think, then we're looking to the steered rates and that gets us there. But then that doesn't necessarily mean that that also gets you to effective competition, whatever that means. Because it could be that the copyright judges would then say, well, we have this facet of the marketplace that's in the evidence and we're going to rely on that. But we have to do even more to get to what we're considering to be effective competition. And the way that the legal analysis was set up and the determination, it seemed like that's where the judges were going. And then what they concluded was that it actually got them to effective competition. And so it was okay. But that seems like that's the gap between arbitrary and capricious review and the Chevron question, but I may not be understanding it correctly. So, Yaron, I think you and I just disagree about what the judges believed effective competition meant. And so let's return to the part of the determination where they lay out what they titled the legal analysis. They explained, for example, and here I'm citing JA 654, that they would decline to include, in their remarks, complementary oligopoly value because they cannot, quote, simply apply the competitive dynamics of the interactive market. They must instead pay attention to, quote, the competitive status of the hypothetical market in which the statutory rate is established. These are not normative judgments or a platonic view of what the non-interactive services market and the competitive aspects of it should look like. They're simply saying that That's on 654? That's on 654, that's right. But then the way that starts is on 653. Thus, the judges conclude that they are bound to follow the prior directives that instruct them to make certain that the statutory rates that they set are those that would be set in a hypothetical, effectively competitive market, which makes it sound like that's the objective. And Your Honor, and forgive me, it's possible that I've just failed to make myself clear. I think it's fair to read the judge's determination when they say effective competition, and then especially later on when they apply it. For example, on 747 and 749, what they are doing is labeling an idea  and the idea is no more complex than the non-interactive services market is qualitatively different and more competitive than the interactive services market. This is the same concept that was referred in prior webcasting decisions and the Web 2 decision that this court reviewed as workably competitive. The judges are not doing anything new here. They're capturing an idea that is drawn from their prior decisions, this court's decisions, and the statute, and explaining that it means that the interactive services market, which has material competitive differences than the non-interactive services market, cannot necessarily provide an accurate analogy that would support rates for the non-interactive services market where copyright owners do not enjoy the same bargaining power. I think the idea is no more complex than that, and it would be odd to read it that way when, as Your Honor pointed out, as you go on into the determination, you see that the judges say, we think that these steered rates in the agreements between the same parties bargaining over the same rights in the same market reflect an effectively competitive market, and they don't go further. They don't say... I understand everything you're saying. On that logic, the section of the determination that says the legal issue of whether effective competition is a required element of the statutory rate, that didn't even have to be there. Under the way you're conceiving of the copyright judge's decision, it turns out that that is an interesting analysis, but it just didn't have to be there at all, because what they in fact did was just got to a point of price competition in the non-interactive services, and then they labeled that effective competition as a conclusion, but it wasn't a statutory objective that they felt like they were compelled to reach. It's just the way that they labeled the conclusion that they did reach. Your Honor, I don't think it's necessary to read that part. I think you and I just disagree about how that part of the judge's determination should be read. I understand them to be explaining to the parties who have briefed extensively before them the issue of effective competition and whether it's required and what analogies are appropriate. I simply understand them to be explaining that the search that they will undertake is for evidence that shows a market that has competitive dynamics that are reasonably analogous to the market for which they are setting a rate. And if it was an excess of diligence or concern for responding to arguments that the parties had made before them, then that should not be a reason to find their determination to be irrational. But again, I think that their application of the effective, what they deemed in short, effective competition, which is baked in to the willing buyer, willing seller standard that Congress established, that their application of it underscores that they did not mean anything more in saying that on pages 651, beginning on pages 651, than they actually did in its application, which was, and again I point the Court in particular to 747 and 749. On 747, in the first full paragraph at the top of the page, the judges explain that they're the DC Circuit, the Librarian of Congress, and the copyright royalty judges have declared to be an essential element. They explain on page 749 that they are treating the evidence through that lens because they're required to consider rates, including evidence that is about competitive information. On page 733, earlier in the determination where they talk about steering and the relationship between steering and an effectively competitive marketplace, they quote their Web 2 decision and explain that what they're trying to do is figure out whether the benchmark agreements require any adjustments to make them analogous, to close the gap between any differences that exist as comparing the benchmark and the target hypothetical market, which in this case is the non-interactive services market and not the interactive services market on which SoundExchange based its evidence, and which again, I don't think it's really disputed here that these markets have material differences. Because SoundExchange raised the segmentation of the market between subscription and ad-supported rates, I'd like to turn to that issue unless the Court has other questions on effective competition. So the common sense point that the judges appreciated here was that the Pandora-Merlin agreement in particular showed that copyright owners accept less and webcasting services pay less in a market where the listener's willingness to pay is zero. Recall the ad-supported interactive services market as compared to the subscription interactive services market produces, as the judges explained on page, excuse me, pages 637 through 644 of their determination, the ad-supported market is simply less lucrative for webcasting services, and they were justified in believing that. And I'd point the Court in particular to J.A. 980, 1020, and 1021. As to whether or not the judges failed to apply what SoundExchange calls a standard test for deciding whether or not there exists material differences between the subscription and non-subscription services market, I don't think even SoundExchange argues that the judges have ever previously committed to taking into account a prescribed set of factors, but in any event, to the extent that they have, they looked at listenership. That's what they've always looked at. And this Court has explained that that's a reasonable way to assess competition and the rates that would ultimately result. I'm happy to address the shadow arguments or any of the other points in the brief. Thank you. We ask that the determination be affirmed. Thank you, Your Honors. Scott Engstrich for the services. After the Webcasting III decision, there was a major technological innovation. Webcasting services were able to make decisions about what songs to play within the broad genres that their listeners had chosen to listen to, based in part on price. And the response to that was that one of the major labels, Warner, and a collective of independent labels, Merlin, voluntarily said, we will take more of your service, play our songs more, and we will take less money for that. And what the judges found, based on extensive evidence, is that that, as in any marketplace, is price competition. Just like car companies selling to Hertz will offer lower prices to get Hertz to buy more of them, this was the first step in a multi-step game of price competition that was made possible by new technology. And the judges, moreover, found, and this is at page 677, hard and persuasive evidence that that competition not only existed in the actual marketplace, but would exist in the hypothetical one. And then again at 1282, found that sound exchanges' arguments on rehearing failed because they ignored that hard and persuasive evidence that actual competition would occur in the hypothetical market. And moreover, they noted, and I have to say this at a high level to avoid revealing confidential information, that to the extent other labels had not entered into deals where they had matched price and reduced price to get more volume, that was because they had an eye on the proceeding. They weren't making business decisions. They were making regulatory based decisions. And there's a reason for this. We got in this proceeding the label's own internal documents. And again, my colleague for the government pointed to page 980, which is a label doing a hypothetical thought experiment. Our expert had done this as well. Turned out so had the labels. What if all listening moved to webcasting? People stopped signing up for Spotify. They stopped buying CDs. They stopped downloading from iTunes. What kind of rate would it take to make the labels whole? And it's right there on the page. I can't say it, but it's right there on the page and I urge you to look at it. 1021, a different label, looking at what's the best thing for our overall business today? Webcasting. The notion that the, and this is when the judges turn to sound exchange's argument. Well, in the hypothetical marketplace, if there wasn't a statutory license, could the labels form a cartel and stop this kind of price competition? Could they punish deviation? Could they prevent anybody from engaging in it? These kind of documents, they show you why. We are not a leech on the labels revenues. The labels recognize that webcasting is an addition to them. It benefits them by turning people who have no interest in paying out of pocket for music into royalty generating listeners. It exposes their music to new fans who then go to concerts and buy merchandise and otherwise contribute to the sale. And that's why what the judges found, and this is at 746 to 749, is that the ways sound exchange suggested that in a statutory license free marketplace, price competition would disappear, would be through demands that people not deviate from a natural market share, which the judges recognize as a classic example of anti-competitive conduct. Anti-steering clauses that would be ripe for judicial invalidation. And the use of upfront lump sum payments, which sound exchange's own expert had described as a means of securing an anti-competitive lessening of competition. So we have factual findings that there would be price competition in the hypothetical marketplace. And that's what the statute directs the judges to look at. We have the judges finding that the only methods of stopping it would be forming a price cartel. And while the judges stopped short of saying that that would result in antitrust, scrutiny, and invalidation, they only stopped very short of that. And so the suggestion, which is what sound exchange makes, is that when setting rates in this hypothetical marketplace, the judges had to assume that the actual competition we saw, and we see in markets everywhere, wouldn't occur because a cartel would be successful, that that's what the statute required them to do, is so far at odds from Congress's purpose in setting up this structure that it's no wonder the judges rejected it. This is not a case where there was evidence that the hypothetical marketplace would be different from the effectively competitive marketplace the judges assumed. They made rigorous, factual findings that that's exactly what would happen. We ask that the decision be affirmed. Thank you. Thank you. I guess I would start with the question about what the basis for the government's defense of the decision is here. I think under Chenery, they have to decide first what the decision says, and then this court can decide whether to uphold it or not on that basis. But I don't see how this decision from the CRJs can exist like a Schrodinger's cat, where maybe it was because of something they did under Chevron. Maybe it was factual. The government isn't going to tell the court, but it would like to win either way. I think it needs to pick a choice on that. I'm happy to engage with the government on that either way. We certainly saw that their brief not referring to Chevron was talking about this as a factual matter. As a factual point of view, I just don't see what the difference between the interactive market and non-interactive market would have to do with the judge's decision about drawing rates out of the Pandora-Merlin and I heart Warner benchmarks. That's the agreements that they drew on to set the 1700s rate. Both of those agreements were reached in the non-interactive market. If there were no interactive market at all, they would have been still looking at those same two agreements. So the government's point about, oh, we have to adjust because of the interactive market is totally irrelevant to the question of how you should handle the numbers that are in the Pandora-Merlin and I heart Warner agreements. And what the government and what the copyright judges did there is they said, we're going to use the steered rates from the Pandora-Merlin agreement. Now, that agreement also, as the court knows, has headline rates also, which are the unsteered rates, if you will. Okay. Well, just as a very basic matter, if you were trying to draw it from the non-interactive market, you would use the headline rates, not the steered rates, because you can't actually give steering to everyone. I mean, the copyright judges conceded that, that they can't give steering to everyone. So why did they use the steered rates? It has to be because of where I started in the opening argument, which is that they thought, as my friend representing the interveners suggested, well, there would be this multi-step game of price competition where there would be steering and that would be a threat and people would cut their rates. But then, I'm sorry, we're back on 746, where the government says, well, there might be a multi-step, excuse me, where the CRJs say, there might be a multi-step game. We're not going to listen to how you on the copyright owner side would negotiate because, sorry, we're not going to listen to it because it's inconsistent with this effective competition mandate. That's a legal determination. That's not a factual resolution of the question of what would happen in that market. Mr. Anschutz offers his version of what would happen. We offered ours. And to that point, of course, there's no agreement in the record where anybody reached any rate because of the threat of steering. So it's not as if there's any actual evidence that the threat of steering accomplishes anything. And it's a factual, it would have to be a factual question that's not resolved here on 746 about how that negotiation would play out. I'd also point out on 746, the copyright judges, contrary to my friend's suggestion about antitrust violations and cartels, judges emphasized, I'm quoting, that their analysis in the text is not intended to suggest any antitrust violations by any actor in the interactive or non-interactive market. This is not an antitrust problem. It is true that sellers with valuable repertoires may drive a hard bargain, but that is their right in a free market to do that. This is not a question about illegal behavior that the judges refuse to consider. The behavior the copyright judges refuse to consider is, they said here in this footnote, is perfectly lawful. It's just they wouldn't consider it because of the statute. Then I guess I would say on the, if we're in the Chevron land and we're asking is this a permissible construction of the statute, we talked about why it sort of isn't textually supported and it isn't supported as a matter of the DMCA structure. The only other reason that I've heard the government give throughout this for interpreting, for suggesting that the statute could be interpreted that way is this idea that well maybe you would be, you would sort of be under some sort of compulsion if there was market power or something like that. The problem there is that in other areas of the law, the tax or eminent domain, we use fair market value. We look at market transactions and we don't say, oh well, we really should hypothesize the rate at which that transaction would have occurred if the market had been hypothetically competitive because otherwise that really wouldn't be a willing buyer, willing seller standard. That idea of fair market value being the actual price that is reached in actual transactions in the market between the actual participants is so embedded in the law that I don't think there's room for a permissible construction that says it's fair market value but it's fair market value in some parallel universe where people behave differently than they do in the real world. So I think there would be further reaching consequences the court would have to confront if it were to allow that as a permissible construction. I thought the reason you started out the way you did was because you understood that this court, these judges are not royalty judges and we have to find an era of law essentially, not an era of judgment unless it's so extreme. And when you say for example in your brief, well the judges refused to consider this and you cite the footnote on 779, when I read that I thought well that's not quite what the footnote says. So I didn't see where the judges were saying we won't hear this evidence or we won't consider what these experts are saying but rather for one reason or another the judges explain why they're not persuaded. And that's basically a judgment and expertise type call. Having listened to all these experts and the arguments of counsel. Your Honor, there are an ample number of places in this determination where they make judgment calls of that nature and we have I think tried to take great care not to challenge those because we do respect that standard. But I think this discussion at 746 is emblematic of the judges saying we're not making a judgment call about the facts. We're saying that the behavior you're talking about would undermine the effective competition standard, I'm quoting from 747 for example, would undermine the effective competition standard that they have understood as a legal constraint on the evidence they can consider. And similarly these would be inconsistent with a statutory direction. I don't think that they're making a judgment call about facts and evidence in this particular context here. I think they are saying the law requires us essentially to say the webcasters can engage in their technological new threat of sneering but the statute requires us to treat the copyright owners as powerless to negotiate and fight back against that. And that's a legal rubric and a legal way of filtering the evidence that is not what the statute envisions when it says market rates. That's why I checked your record sites when you said they refuse to consider something and I don't find those record sites supports your argument. That's all I'm saying. I mean I understand the board decided for one reason or another it wasn't going to accept your proposal, it wasn't going to agree with some things your experts said but that's a different situation than saying we're simply not going to hear this evidence and we're not going to consider the arguments. I don't see that. Well I would encourage your honor to read 746 to 749 and you will not find there an answer to the question that's posed in the heading. The question posed in the heading is can the majors avoid steering in the hypothetical market? There's not a factual answer to that. The answer is I don't know but it would be inconsistent with the statute for them to do so so we won't consider it. Did you understand the legal part of the determination where it's treating with effective competition so there's the first part of it that says that we're compelled to read effective competition into the statute and then there's a fallback part that says even if we're not compelled then it's still a reasonable construction. On the fallback part of it is that what's your argument as to why that isn't persuasive? Do you think that they're in fact engaging in a different analysis in saying we're no longer compelled but we're reaching this conclusion anyway as a matter of our discretion? I do find it a little odd for an agency to exist in that sort of limbo between the two. They do say that to the extent competitive information is ambiguous we would interpret it in a way that requires us to set this effectively competitive rate. Now for the colloquy we had earlier that is contrary to what the register has told them so I don't think that's a permissible move for this body to make. I suppose in theory the register could have confronted this again, decided to change position given reasons for that and so forth. We don't have anything like that of course. That's one problem and then there are the larger problems that the text and the structure and the established meaning of a fair market value standard mean that any standard under which you're going to assess fair market value in again this parallel universe where the market actors behave differently I think is an impermissible construction of the statute because the competitive behavior in the market is a function of who's in the market, what they're buying and what they're selling and if you're going to start supposing that they behave differently you're supposing actors who are not the record companies. It's not the webcasters anymore it's just sort of a policy judgment about what the rates should be which is problematic. Thank you.
judges: Rogers, Griffith, Srinivasan